IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

TABOAS COLON, et al

    Plaintiffs

DIAZ-GONZALEZ, et al                **CIVIL NO. 04-2371 (SEC)**

    Defendants

**OPINION AND ORDER**

On September 12, 2009, Plaintiffs William R. Taboas-Colon (hereinafter "Taboas"), his wife and their conjugal partnership (collectively "Plaintiffs") filed a "Motion for Summary Judgment as to the De Jesús' Co-Defendants" (Docket # 128) and a "Statement of Undisputed Material Facts in Support of Motions for Summary Judgment against all Co-Defendants" (Docket # 129). Co-Defendant Angel De Jesús (hereinafter "De Jesús"), his wife and their conjugal partnership did not file an opposition. As such, Plaintiffs' Motion for Summary Judgment is deemed unopposed.

After reviewing the filings and the applicable law, Plaintiffs' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

**Factual and Procedural Background**

The facts of the instant case were set forth in our previous Opinions and Orders of November 6, 2007 (Docket # 48), January 10, 2008 (Docket # 73), February 5, 2008 (Docket # 80) and January 23, 2009 (Docket # 193). On December 14, 2004, Plaintiffs filed the instant suit against Angelo Díaz-Gonzalez, Angel de Jesús (collectively "Defendants"), their respective wives and conjugal partnerships, and various unnamed defendants. Plaintiffs seek to rescind an investment contract (the viatical settlement)[1], to which they allegedly entered moved by Defendants' investment advice, and to obtain

---

[1] A viatical settlement is a transaction in which a holder of a life insurance policy (the viator) sells the policy to a third party at a discount, which in turn sells it to various customers who would receive the benefit of a lump sum upon the

restitution of the monies paid in furtherance of that contract, as well as interest computed therein, damages, attorney's fees and costs.

Per Plaintiffs' allegations, Mutual Benefits Corporation ("MBC"),[2] which is not a party to this action (see Docket # 34), was a viatical settlement provider, who used to sell said products through sales agents or representatives. According to Plaintiffs' Complaint, Defendants sold the aforementioned investment to Plaintiffs as agents/representatives of MBC, in violation of federal law. The remaining causes of actions are for fraud, breach of contract, breach of fiduciary duty, and negligent misrepresentations.

**Standard of Review**

*R. Fed. Civ. P. 56*

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).  In reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

viator's death. See Docket # 1, at p. 4; see also Black's Law Dictionary 1405 (8th Ed. 2004)(defining a viatical as "a transaction in which a terminally ill or chronically ill person sells the benefits of a life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value.")

2  MBC is currently a defendant in an action initiated by the SEC in the United States District Court for the Southern District of Florida for securities laws violations. SEC v. MBC, Civil No. 04-60473 (D. Fla.).  MBC cannot be joined in this action because it has been placed under a TRO and Assets Freeze, and is under the direction of a Receiver.

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . . Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

Civil No. 04-2371(SEC)                                                                                  4

**Applicable Law and Analysis**

On September 12, 2008, Plaintiffs filed the motion for summary judgment against De Jesús (Docket # 128). Because the instant motion is for summary judgment, the parties must comply with the requirements of Local Rule 56, and file a statement of facts, set forth in numbered paragraphs, and supported by record citations. See Local Rule 56(b). Plaintiffs complied with this rule and submitted a Statement of Uncontested Material Facts (Docket # 129)(hereinafter "Plaintiffs' SUMF"), numbered, and supported by record citations. After reviewing Plaintiffs' SUMF together with the accompanying evidentiary documentation, this Court finds that the facts proposed by Plaintiffs are properly supported by admissible evidence.

In turn, when confronted with a motion for summary judgment, the opposing party must:

> [s]ubmit with its opposition a separate, short, and concise statement of material facts. The opposition shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

Local Rule 56(c).

If the opposing party fails to do so, "summary judgment should, if appropriate, be entered." FED. R. CIV. P. 56(e)(2). These rules "are meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court." Cabán-Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8(1st Cir. 2007). When the parties ignore the Local Rule, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28 (1st Cir. 2000).

In the instant case, De Jesús failed to file an opposition. As a result, and per FED. R. CIV. P. 56(e)(2), Plaintiffs' "Motion for Summary Judgment as to the De Jesús Co-defendants" is deemed unopposed. Thus, the Court will deem as admitted those facts which are supported by the record, and which Defendants failed to deny or qualify. This solution is consistent with Local Rule 56, and First Circuit precedent. See Philip Morris, 486 F.3d at 8 (stating that "the district court acted justifiably in rebuffing the appellants' proffered counter-statement and crediting Phillip Morris' version of the facts;

[since] the appellants did not admit, deny or qualify Phillip Morris' assertions of fact paragraph by paragraph as required by Local Rule 56.")

### *Uncontested Facts*

According to Plaintiffs' SUMF, the uncontested facts are as follows:

Plaintiffs had a broker-client relationship with Defendants prior to buying the viatical settlement contract, since they previously sold him life and disability insurance. Plaintiffs' SUMF ¶ 56. Thus, Plaintiffs trusted Defendants. Id. Defendants actively and directly solicited Plaintiffs to buy the viatical settlement contract object of the instant suit. Plaintiffs' SUMF ¶ 2. When Plaintiffs met with Defendants, prior to buying said contract, De Jesús provided Plaintiffs with his business card, and represented himself to be the District Manager for American General Insurance. Plaintiffs' SUMF ¶ 3. Defendants gave Plaintiffs an oral presentation and provided them with written material about the viatical contract they were selling. Plaintiffs' SUMF ¶ 4 & 5. Specifically, Defendants provided Plaintiffs with documentation which accredited: (1) that MBC, a Florida Corporation, offered its services across the United States and its viatical contracts were characterized by total fixed returns of 12%, 21%, 28%, 42% and 72%, (2) that all the funds for the payment of future premiums based on the life expectancy of the seller were kept in a Citibank account, (3) that MBC worked with reputable counsel in the field as well as insurance departments from different states in order to stay informed about legal developments in the industry; (4) that each policy is backed by MBC, and (5) that the medical histories are evaluated by licensed doctors from each state. Plaintiffs' SUMF ¶ 6, 7 & 8.

A document provided by Defendants, titled "Smart Money Report", states that a viatical settlement contract is not a stock and thus, is not affected by the stock exchange, mutual funds, annuities, bonds or the market's interest rates.  Plaintiffs' SUMF ¶ 9.  The document further provides that said contracts are provided by a licensed company, which offers two digit returns of 12 to 72%, that all capital and returns are paid by North American insurance corporations and that MBC was a licensed company. Id. Defendants also provided Plaintiffs with a document explaining the process for buying

a viatical contract, which stated that "at the policy's maturity, the insurance company that issued the policy, pays directly to the registered policy beneficiary." Plaintiffs' SUMF ¶ 10. Plaintiffs asked Defendants if the proposed investment was legal, and both Defendants affirmed it was. Plaintiffs' SUMF ¶ 11.

On October 30, 2002, Plaintiffs signed a Viatical Purchase-Sale contract and Trust Agreement, for the purchase of a viatical sold by Defendants. Plaintiffs' SUMF ¶ 12. Defendants told Plaintiffs that an investment in the viatical settlement field was safe and described MBC as a serious corporation, a leader in the viatical industry. Plaintiffs' SUMF ¶ 56. They also stated that the $80,000 investment would have a 60% return in 5 years, and Plaintiffs would earn $128,000.00. Id. Plaintiffs paid Defendants, as representatives of MBC, $80,000. Plaintiffs' SUMF ¶ 12. De Jesús  signed the receipt for the $80,000 received from Plaintiffs for the viatical contract and earned commissions for the sale of the viatical contract to them. Plaintiffs' SUMF ¶ 55.

The before mentioned contracts were provided by Defendants, and specifically, the Viatical Purchase-Sale contract was later mailed to Plaintiffs, with MBC President, Peter Lombardi's signature. Plaintiffs' SUMF ¶ 12. The Purchase-Sale contract stated that the economic benefit derived from said agreement stemmed from the insured's death, and not as a result of the efforts of any person or entity employed or associated with MBC. Plaintiffs' SUMF ¶ 13. The contract further provided that the buyer and MBC agreed that neither MBC nor any of its representatives acted as an agent, broker, or stock broker, and that the object of the contract was not the sale of a security. Plaintiffs' SUMF ¶ 14. MBC's President sent Plaintiffs a letter dated November 8, 2002, welcoming them to MBC's viatical business program, confirming the receipt of $80,000 and assuring that the purchase of the viatical contract secured a maximum fixed return for all the funds used for the acquisition of the life insurance. Plaintiffs' SUMF ¶ 17 & 18. On December 2, 2002, Plaintiffs received another letter from MBC's president, confirming that Plaintiffs' investment was for $80,000, with a return investment of 60%,

which would amount to $128,000.00. Plaintiffs' SUMF ¶ 19.  However, to this date, Plaintiffs have not received any money from their investment. Plaintiffs' SUMF ¶ 57.

On June 11, 2002, four months before Plaintiffs bought the security sold by Defendants, the Commissioner of Financial Institutions of Puerto Rico (CFI) had issued Circular Letter CIF CC-02-2, explaining that the Uniform Securities Act of Puerto Rico, Law No. 60, June 18, 1963, 10 P.R. Laws Ann. §§ 851 *et seq*., as amended, was applicable to viatical contracts and, thus, all persons selling viatical contracts were obligated to comply with the requirements of said law and Regulation 6078 dated January 19, 2000. Plaintiffs' SUMF ¶ 34. Furthermore, on June 14, 2002, more than four months before Plaintiffs' purchase, El Nuevo Día published a report specifying that viaticals were securities and, as such, must be registered at the CFI's Office. Plaintiffs' SUMF ¶ 35. The report also specified that a broker's license under the securities law was needed in order to sell viaticals. Id. The newspaper report also mentioned that, when marketing viatical contracts in Puerto Rico, sellers were emphasizing that viatical contracts were not affected by changes in stocks, bonds and interest rates, and therefore, were better alternatives than certificates of deposits. Id.

On October 9, 2002, De Jesús received Circular Letter CIF CC-02-2 via fax and read its contents on said date. Plaintiffs' SUMF ¶ 36 & 37. Therefore, De Jesús knew of the existence of Circular Letter CIF CC 02-2 before selling the viatical settlement to plaintiffs on October 2002. Id. Although the letter specifically mentions that every person involved in the selling of viatical contracts is obligated to comply with the Uniform Securities Act of Puerto Rico and Regulation 6078 governing the registration of the persons involved in the business of investment in viatical contracts, De Jesús believed that he did not need any type of license, because he sold policies with cash values and he had a license to sell insurance policies.  Plaintiffs' SUMF ¶ 40 & 44. During his deposition, De Jesús acknowledged that he had little expertise about viaticals and that at the time he sold the viatical to Plaintiffs, he was inexperienced in the field. Plaintiffs' SUMF ¶ 41-43. His training regarding viatical contracts consists of: (a) attending a 45 minute conference offered by an insurance agent, in Díaz's office, during which

he was provided with a binder with MBC's logo and information about viaticals, and (b) calling MBC's offices and CFI's office, as well as asking other insurance agents about said product. Plaintiffs' SUMF ¶ 41. De Jesús further admitted that he and Díaz did not explain to Plaintiffs when they originally made their investment that, in addition to their original investment of $80,000, they may have to pay more money for premiums in order to receive the promised benefits. Plaintiffs' SUMF ¶ 47. De Jesús assumes that the person who is administering MBC, a trustee, pays the premiums on the policies, and if any premium is not paid by "them," then the investors must pay the premiums. Plaintiffs' SUMF ¶ 46.

Plaintiffs learned, through a report published on May 22, 2004 in the <u>El Nuevo Día</u>, that MBC's viaticals were not registered at the Puerto Rico Office of Financial Institutions, that a cease and desist order had been issued against MBC in Florida, and that MBC had been sued by the Securities Exchange Commission (SEC) in said state. Plaintiffs' SUMF ¶ 20 & 21. On June 3, 2004, the CFI's office issued a certification stating that MBC was not registered in Puerto Rico under the Uniform Securities Act of Puerto Rico. Plaintiffs' SUMF ¶ 38. On even date, said office also issued a certification stating that Defendants were not registered as agents or brokers under the Uniform Securities Act of Puerto Rico. Plaintiffs' SUMF ¶ 39.

Upon learning of said information, Plaintiffs requested to meet with Defendants.  Plaintiffs' SUMF ¶ 22.  During their meeting with De Jesús, Plaintiffs explained that due to the complaint filed by the SEC against MBC, they were willing to return the viatical contract to Defendants in exchange for the initial investment of $80,000, and De Jesús responded that he would "think about it and respond to the offer later." Plaintiffs' SUMF ¶ 25. However, Plaintiffs' attempts to contact Defendants were fruitless, and neither Defendant responded to Plaintiffs' offer to return the security. Plaintiffs' SUMF ¶ 26.

Moreover, before Defendants sold to Plaintiffs the investment involved in this case, there were numerous public reports regarding the risks involved in the security known as viatical contracts. For example, on February 4, 2000, the Fifteenth Statewide Grand Jury of the Supreme Court of Florida

issued a report on fraud in the viatical industry. Plaintiffs' SUMF ¶ 52. Among the findings of the Grand Jury is a fraud named "cleansheeting," which consists of applying for life insurance and intentionally failing to disclose the applicant's status as terminally ill. Id. The applicant then falsely answers medical questions in the application resulting in a cleansheeted policy. Id.

Furthermore, a press release by the North American Securities Administration Association dated February 26, 2002, reported the hearings held by the Subcommittee on Oversight and Investigation of the House of Financial Services Committee. The hearings explain the well documented fraud in the marketing of viaticals. Plaintiffs' SUMF ¶ 48 & 49. During said hearings, Vermont State Regulators alleged that MBC "concealed insurance fraud and misrepresented the life expectancies of dozens of policies sold to investors…". Id. Furthermore, other particular situations revealing widespread fraud in the viatical contracts were identified. Id. Also, it was mentioned that "[s]ecurities regulators from 21 states report bringing actions on behalf of thousands of investors nationwide who were defrauded of more than $400 million over the past three years…" Id.

Moreover, there was public information available regarding MBC's business dealings and fraudulent actions, such as:

1. On May 1, 1998, the SEC issued Press Release No. 157927 explaining that "two South Florida men who founded and controlled Mutual Benefits Corporation ("MBC") … settled charges brought against them by the SEC for allegedly misleading investors in connection with selling approximately $100 million worth of viatical settlements during the 18-month period from October 1994 to April 1996 … Joel Steinger and his brother Leslie Steinger consented, without admitting or denying liability to the entry of a judgment permanently enjoining them from violating the registration and antifraud provisions of the federal securities laws … the Steingers will also be required to pay a total of $850,000 in disgorgement and interest…" Plaintiffs' SUMF ¶ 54.

2. On November 17, 2000, the Department of Community and Economic Development, Division of Banking, Securities and Corporations of the State of Alaska executed jointly with MBC a Settlement Agreement. In said settlement agreement, under Alaska's law, the viaticals are investment contracts and thus a security. Therefore, MBC violated the Alaska law by selling

unregistered securities and further by not having its registration as broker-dealer as required. Plaintiffs' SUMF ¶ 50 & 51.

3.   On May 3, 2003, the SEC filed a Complaint for injunctive relief and other relief against MBC, among others, in the United States District Court, for the Southern District of Florida (Case No. 04-60473-CIV).  Plaintiffs' SUMF ¶ 27. The SEC alleged that the defendants MBC, J. Steinger, L. Steinger and Peter Lombardi incurred in violations of the Securities Act since no registration settlement was filed or is in effect with SEC pursuant to the Securities Act and no exemption from registration exists with respect to the securities transactions involving the selling of viatical settlement agreements. The defendants were also charged with fraud for violation of fraud in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 117 C.F.R. 240 10b-5, among others. Lombardi, as Director and President of MBC, was charged with aiding and abetting MBC's violations of section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, 15 U.S.C.  § 78(j)(b) and Rule 10b-5, 17, C.F.R.  § 240.10b-5.[3]

4.   As a result, on or about May 4, 2004, the Southern District of Florida, entered a Temporary Restraining Order (TRO) suspending MBC's business and effectively enjoining defendants in the referred case from further conducting MBC's business. Plaintiffs' SUMF ¶ 28.

5.   On May 6, 2005, the United States Court of Appeals for the Eleventh Circuit confirmed that viatical contracts, including the ones sold by MBC, are investment contracts under the Securities Act of 1933 and 1934. S.E.C. v. Mutual Benefits Corp.,408 F.3d. 737 (2005). Plaintiffs' SUMF ¶ 53.

6.   On May 3, 2004, the Florida Office of Insurance Regulation (FOIR) issued an Emergency Cease and Desist Order suspending the license of MBC. Plaintiffs' SUMF ¶ 29. Prior to its issuance, the referred order the FOIR investigated the business activities of MBC for the period of the year 1999 through September 2003. Id. Among the findings of Ms. Janice S. Davis, the Financial Specialist employed by the FOIR, who examined MBC's records, stated that:

> ...MBC's advertisements routinely state that the princip[al] and
> return will be 'paid directly by Top-Rated Insurance Companies'
> or 'paid directly by America's highest rated insurance companies

---

[3]  The SEC's complaint also includes charges for violation of section 20(a), as control person of MBC, against Mr. J. Steinger, the de facto Chief Executive Office of MBC who, SEC alleges, has an extensive disciplinary background including regulatory actions and a criminal conviction, and whose involvement in MBC's activities and disciplinary history were not disclosed to plaintiffs; violation of section 20(a), 15 U.S.C. sec. 70t(a), as control person of MBC, against Mr. L. Steinger, the brother of J. Steinger who, as per SEC's allegations, was a "consultant" to MBC, but in reality one of the principals of MBC, in charge of running its sales force. Mr. L. Steinger also had, as per SEC's allegations, a civil disciplinary background and his activities and disciplinary history were not disclosed to plaintiffs **.**

> to the purchaser upon the maturity of the policy.' However the advertising does not disclose that the princip[al] and return are paid to a 'trustee' or an escrow agent, who then is responsible for payment to the purchaser. In addition, advertisements state that the returns are 'Fixed, Total Returns' without disclosing that the return can be affected by premium costs if the policy does not mature within the projected life expectancy period, nor does the advertising or viatical settlement purchase agreement disclose to the purchaser the extent of liability that the purchaser may incur in premium costs for their own portion (or for the portion that other purchasers might choose not to pay, but which needs to be paid in order for the policy to stay in force.) Further, no disclosures are made to purchasers that 90% of the policies that are currently active are beyond their projected life expectancy...[b]ased on my review, MBC advertises to its prospective purchasers that funds used to pay future premiums are held in an interest bearing account but no mention is made to prospective purchasers that the interest earned on their funds is retained by MBC or the trustee for payment of premiums on policies that are already beyond the assigned life expectancy." (Emphasized). Plaintiffs' SUMF ¶ 30.

Furthermore, in relation to fraudulent and/or illegal practices by MBC, Davis found that "MBC has failed to set aside or escrow the amount of money to cover premiums for a minimum of life expectancy, in violation of its contractual agreements with at least 1,299 purchasers of 61 policies purchased. The face value of these 61 policies is approximately $79 million." Plaintiffs' SUMF ¶ 31.

7.    On February 14, 2005, the United States District Court for the Southern District of Florida issued a preliminary injunction in the suit filed by the SEC against MBC. Plaintiffs' SUMF ¶ 32. In granting the preliminary injunction, the Florida District Court found sufficient evidence of fraud committed by therein defendants. Specifically, the court concluded that it found credible evidence that the "announced life expectancies were the product of fraud." Id.

8.    On April 10, 2007 a Final Judgment of Permanent Injunction and other relief as to MBC was entered by the Florida District Court (S.E.C. v. M.B.C., Civil No. 04-60573). Plaintiffs' SUMF ¶ 33.

***Plaintiffs' Claims***

Plaintiffs' complaint contains seven counts, including claims that arise under Sections 12(a)(2) of the Securities Act of 1933, 15 U.S.C. 77l(a)(2), Section 10(b) of the Securities Act of 1934, 15 U.S.C. 77j(b), and Rule 10b-5 of the SEC, 17 C.F.R. 240.10b-5. In counts three to seven, Plaintiffs make

general allegations of fraud, breach of contract, breach of fiduciary duty[4] and negligent misrepresentation[5]. Based on the seven before mentioned claims, Plaintiffs seek to receive the consideration paid, that is, $80,000, plus interest, attorney's fees, costs, $48,000.00 for the promised return on the investment, and no less than $100,000.00 in punitive damages.

Plaintiffs' arguments focus on the Section12(a)(2), Section 10(b) and Rule 10b-5 claims. In the motion for summary judgment, counts three (3) to seven (7) are premised on the economic losses suffered by Plaintiffs due to Defendants' material misrepresentations and omissions in the sale of the viatical settlement contract. Thus, all of Plaintiffs' claims rest on whether Defendants committed the acts and omissions alleged in the complaint and the instant motion, and which are addressed in Counts one (1) and two (2), that is, the allegations under Section 12(a)(2), Section 10(b) and Rule 10b-5.

---

[4] Most securities law suits include breach of fiduciary duty claims and said claims are addressed under common or state law. See e.g., Kircher v. Putnam Funds Trust, 547 U.S. 633, 637 (2006); Oppenheimer Fund v. Sanders, 437 U.S. 340, 344 (1978); In re Heritage Bond Litig. v. U.S. Trust Corp., 546 F.3d 667, 671-72 (9th Cir. 2008); See e.g. Trachsel v. Buchholz, No. C.-08-02248 RMW, 2009 U.S. Dist. LEXIS 4219, at *5 (N.D.Cal. 2009); G.K. Las Vegas v. Simon Prop. Group, Inc., 2008 U.S. Dist. LEXIS 100244, at *6-7 (D.NV. 2008); Hoffman v. UBS-AG, No.05 Civ. 6817, 2008 U.S. Dist. LEXIS 85065, at * 15 (S.D.NY. 2008); In re Trade Partners, Inc. Investors Litig., No. 1:07-MD-1846, 2008 U.S. Dist. LEXIS 66464, at * 53 (W.D.MI. 2008); Segatt v. GSI Holding Corp., No. 07 Civ. 11413, 2008 U.S. Dist. LEXIS 58102, at *21 (D.S.N.Y. 2008); First Presbyterian Church of Mankato v. Kinnard & Co., 881 F. Supp. 441, 446 (D.MN. 1995); see cf. United States v. O'Hagan, 521 U.S. 642, 652 (1997) (finding that misappropriation of confidential information for securities trading purposes is a breach of the fiduciary duty owed to the source of the information and constitutes fraud in connection with a securities transaction, in violation of Section 10(b) and Rule 10b-5.). Fiduciary duty is defined as: "[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary to the beneficiary; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person." BLACK'S LAW DICTIONARY 545 (8th ed. 1999). As such, "a fiduciary must exercise a high standard of care when managing another's money." Id. at 658.

[5] Some negligent misrepresentation claims arise under state tort law. See New Eng. Surfaces v. E.I. du Pont de Nemours & Co., 546 F.3d 1 (1st Cir. 2008); Rodowicz v. Massachusetts Mutual Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002); Jordan-Milton v. F/V Teresa Marie, II et al, 978 F.2d 32, 36 (1st Cir. 1992); First Presbyterian Church v. Kinnard & Co., 881 F.Supp. 441, 446 (D. Minn. 1995); Weber v. Sanborn, 526 F. Supp. 2d 135, 147-148 (D. Mass. 2007). Others have been addressed as common-law claims. Smiley v. Citibank,, 517 U.S. 735, 739 (1996); Curtis Pub. Co. v. Butts, 388 U.S. 130 (1967). The Supreme Court has looked to the Restatement of Torts when defining negligent misrepresentation under the Federal Torts Act, specifically Section 2680(h). See US v. Neustadt, 366 U.S. 696, 711 (1961); Sheridan v. United States, 487 U.S. 392 (1998). The Puerto District Court and First Circuit have also addressed the issue in federal torts cases. Fina Air Inc. v. USA, 555 F. Supp. 2d 321, 325 (D.P.R. 2008); Díaz Castro v. USA, 451 F. Supp. 959, 960-961 (D.P.R. 1978) (finding that courts have "looked to federal rather than local law" when applying the tort of negligent misrepresentation found in Section 2680(h) of the Federal Tort Act). The Puerto Rico District Court has recognized claims for negligent misrepresentation arising under Article 1802 of the Puerto Rico Civil Code. Rivera v. Parade of Toys, 950 F. Supp. 449, 451 (D.P.R. 1996).

First, this Court will address Plaintiffs' Section 12(a)(2) claim, which includes discussion as to their allegations of breach of fiduciary duty and negligent misrepresentation.

### I. Section 12(a)(2) Claim

Section 12(a)(2) of the Securities Act of 1933 allows for the imposition of civil liability arising in connection with the improper use of prospectuses and communications in the sale of securities. It provides, in pertinent part, that any person who offers or sells a security:

> by use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to *recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.* (emphasis added). 15 U.S.C. 77l(a)(2).

In other words, "Section 12(2) creates a right of action for a purchaser who claims the security he or she bought was offered or sold by means of a ... communication which includes an untrue statement of a material fact or omits to state a material fact." Quincy Co-Operative Bank v. Edwards & Sons, 655 F. Supp. 78, 82 (D. Mass. 1986).  Its purpose is to "ensure that potential purchasers are given correct, material information before purchasing securities[, since] those who undertake to sell securities are charged with seeing to it that their customers receive that information. Failure to do so either deliberately or through carelessness results in liability unless the seller is able to prove that he acted reasonably despite the fact that his purchaser received false or misleading information" Id. at 84.

The Supreme Court has held that Section 12 applies to brokers and others who solicit securities purchases and, thus, is not restricted to those who pass title. Therefore, any person who solicits and sells securities may be liable under Section 12. Pinter v. Dahl, 486 U.S. 622, 646 (1987); see also Shaw v.

Digital Equipment Corp., 82 F. 3d 1194, 1214  (1st Cir. 1998); Cady v. Murphy,113 F.3d 988, 991 (1st Cir. 1940).

### Section 12(a)(2) Standard

To prevail in a claim under Section 12(a)(2), Plaintiffs must show that Defendants (1) offered or sold a security, (2) by the use of any means of communications in interstate commerce, (3) through a prospectus or oral communication, (4) by making a false or misleading statement of a material fact or by omitting to state a material fact, (5) that they did not know of the untruth or omission, and (6) that Defendants knew, or in the exercise of reasonable care could have known, of the untruth or omission. Wright v. National Warranty Company, 953 F. 2d 256, 262 (6th Cir. 1992) (citations omitted); Cook v. Avien, 573 F.2d 685, 693 (1st Cir.1978).

Fraud is not an element needed to establish a Section 12(a)(2) claim. See Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997); Miles v. Merrill Lynch & Co., 483 F.3d 70, 73 n.1 (2nd Cir. 2007) (citing Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3rd Cir. 2006). Moreover, unlike Section 10(b) claims, which will be discussed shortly, the negligent misrepresentation of a material fact on behalf of the seller is sufficient for a Section 12(a)(2) claim. Negligent misrepresentation is generally defined as "[a] careless or inadvertent false statement in circumstances where care should have been taken." BLACK'S LAW DICTIONARY 1022 (8th ed 2004).[6]   Therefore, a claim is actionable under Section 12(a)(2) if the seller makes a false or misleading statement knowing it to be untrue, or at least omits to state a material fact which could have been known if he had exercised reasonable care.

---

[6]   In the context of torts, the traditional legal definition of negligent misrepresentation is the ". . . duty to use due care in obtaining and communicating information upon which [the plaintiff] may reasonably be expected to rely . . ." Block v. Neal, 460 U.S. 289, 296 (1983) (citing United States v. Neustadt, 366 U.S. 696, 706-707 (1961); see also Fina Air Inc. v. United States, 555 F. Supp. 2d 321, 325 (D.P.R. 2008). It encompasses negligent as well as willful misrepresentation. Fina Air, 555 F. Supp. 2d at 325(citing Neustadt, 366 U.S. at 702).

Once the plaintiff has established liability under said test, in those cases where the plaintiff still owns the security, Section 12(a)(2) provides the remedy of rescission upon tender of the security. The remedy of rescission seeks to restore Plaintiff to his position before the purchase of the security while serving as a measure of deterrence. Randall v. Loftsgaarden, 478 U.S. 647, 659 (1986). If the plaintiff no longer owns the security, she is only entitled to damages, albeit the Supreme Court has held that "damages are to be measured so as to result in the substantial equivalent of rescission." Id. at 655-656.

In the instant case, there is no controversy as to the fact that Defendants sold Plaintiffs a viatical. Plaintiffs' SUMF ¶2. Furthermore, Defendants gave oral presentations to Plaintiffs, and made use of the mail in order to complete the sale of said viatical, since all the documents given to Plaintiffs by Defendants were in turn provided to Defendants by MBC, a Florida corporation. Plaintiffs' SUMF ¶ 12, 17 & 18. It has been held that Section 12(a)(2) only requires that a defendant sell a security "by use of the mails, even though the seller's untrue or misleading statement is communicated orally and intrastate." See Shillner v. Vaughan Clarke & Co., 134 F. 2d 875, 877 (2d. Cir. 1943).[7]

Although in the complaint Plaintiffs did not plead with particularity which communication satisfied the jurisdictional requirement of Section 12(a)(2), it is clear from the instant motion that the mails were used in the process of selling the viatical settlement to Plaintiffs. Moreover, it is apparent from Plaintiffs' SUMF that Plaintiffs received, via mail, interstate communications in relation to the sale of the viatical settlement. Specifically, Plaintiffs received the contracts by mail, signed by Peter Lombardi, President of MBC. Plaintiffs' SUMF ¶12, They also received letters from Lombardi, sent

---

[7] A Court may deny a motion to dismiss for lack of jurisdiction when it appears from the record that the mail was used in the process of selling a security, even after completing the sale. See Wigand v. Flo-Tek, Inc., 609 F. 2d 1028, 1033 (2d. Cir. 1979) (stating that "the use of mails is apparent on the record... Defendants' transfer agent mailed the certificate of Flo-Tek to Wigand in May 1972, and such use of mails is sufficient to support jurisdiction under the 1933 Act."); see also Shaw, 82 F. 3d at 1220 (stating that in deciding a motion to dismiss a securities action the "court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into a one for summary judgment.").

from Fort Lauderdale, Florida, which included a copy of the certificate of insurance and the reviewing medical physician's report regarding the policy. Plaintiffs' SUMF ¶ 17-19.

Furthermore, MBC, the seller of the viatical settlement, is a Florida Corporation, while Plaintiffs and Defendants are residents of Puerto Rico. The First Circuit, in a RICO case where Defendants were incorporated in different states, reasoned that  "in this day and age, it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires." New England Data Services, Inc. v. Becher, 829 F. 2d 286 (1st Cir.  1987). This Court believes that such reasoning applies with equal force in this case. Thus, all the documents provided by Defendants to Plaintiffs were sent by the use of the mail or interstate communications. As such, the jurisdictional requirement of Section 12(a)(2) is met in this case.

Furthermore, Plaintiffs have provided a detailed account of Defendants' material misrepresentations and omissions. Specifically, they have shown that there was plenty of publicly available information that discredited Defendants' statements and which should have alerted them to make a more detailed investigation into the field of viatical settlement and, on MBC, prior to recommending the investment to Plaintiffs.

Plaintiffs demonstrated the following material omissions by Defendants: (1) failure to disclose that the viatical settlement was a security that needed to be registered with the SEC (Plaintiffs' SUMF ¶ 20, 34-37, 38, 53); (2) failure to disclose that Defendants were not registered nor licensed to sell securities as required by the Uniform Securities Act of Puerto Rico, (Plaintiffs' SUMF ¶ 39); (3) the disciplinary history of MBC and its principals, (Plaintiffs' SUMF ¶ 20, 27-33, 49-54); (4) the injunction issued against MBC's principals for their violations of the anti-fraud and registration provisions of the federal securities laws in connection with the sale of viatical settlements, (Plaintiffs' SUMF ¶ 27-33); (5) that several states had issued injunctions against MBC and its principals for securities fraud and registration violations, (Plaintiffs' SUMF ¶ 20, 27-33, 49-54); (6) the Fifteenth Statewide Grand Jury of the Supreme Court of Florida's findings on fraud in the viatical industry, as to the risks and

consequences of a fraud known as "cleansheeting," (Plaintiffs' SUMF ¶ 52) and (7) failure to disclose that De Jesús had little knowledge and training about viaticals (Plaintiffs' SUMF ¶ 41-43).

Plaintiffs also show that Defendants made material misrepresentations in their attempt to sell the viatical settlement, by: (1) stating that the proposed investment was in compliance with the law, despite the lack of registration of the viatical settlement with the SEC, the Puerto Rico Office of Financial Institutions, and the fact that Defendants did not have a license to sell securities, (Plaintiffs' SUMF ¶ 20, 34-37); (2)  representing to Plaintiffs that the viatical settlement was not a security, despite having read Circular Letter CIF-CC-02-2, (Plaintiffs' SUMF ¶ 13, 14, 44-47 & 53); (3) assuring Plaintiffs, through oral presentations and prospectus, that they would receive fixed returns of 12-72% on their investment, and that it was a low risk investment, despite the public information regarding the fraudulent sale of viaticals in Puerto Rico and the United States,  (Plaintiffs' SUMF ¶ , 4-6, 9 & 19); (4) that MBC was the leader in the viatical settlement industry in spite of the multiple cease and desist orders issued against it in various states,  (Plaintiffs' SUMF ¶ 6-10); (5) stating that MBC was a licensed entity, (Plaintiffs' SUMF ¶ 6); and (6) stating that the sale of the securities by MBC was legal (Plaintiffs' SUMF ¶ 4,11, 34, 38, 39 & 53).

Based on the foregoing, this Court concludes that Defendants omitted and misstated many facts that were material to Plaintiffs' investment decision.

Since Defendants advised Plaintiffs to buy the viatical settlement, they had the responsibility to fully inform Plaintiffs of all relevant and material information regarding the viatical settlement. As previously stated, brokers and those who solicit and sell securities by using untrue statements of fact or omitting material information, are responsible under Section 12(a)(2). Pinter, 486 U.S. at 646. The Supreme Court held that Section 12's language, which provides, in pertinent part,  "any person who

offers or sells a security..."[8] expressly extends liability to any person who engages in said conduct, and not just licensed brokers. Thus, any person who sells or solicits securities:

> ... cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on [that investigation]; [and] [w]here the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.
> Quincy, 655 F. Supp. at 86 (citing Hanly v. S.E.C., 415 F.2d 589, 597 (2nd Cir. 1969)).

Based on the foregoing, this Court finds that Defendants knew, or in the exercise of reasonable diligence could have known, of the untruth of their statements and omissions. See Cook, 573 F. 2d 685. Plaintiffs have met the requirements of a claim under Section 12(a)(2) and as such, Defendants are liable to Plaintiffs under said section. Therefore, Plaintiffs' Section 12(a)(2) claim is **GRANTED**.

### *Damages under Section 12(a)(2)*

Under said section, the remedies provided to the buyer are limited to recovering the consideration paid for the security with interest, less any amount of income received, upon tender of the security, or for damages if the buyer no longer owns the security. See Pinter, 486 U.S. at 661. However, "nothing in § 12(2) explains when or how tender is to be accomplished." In re Gap Stores Sec. Litigation, 79 F.R.D. 283, 307 (N.D.Ca. 1978). To tender is defined as "a valid and sufficient offer of performance." BLACK'S LAW DICTIONARY 1507 (8th ed. 2004).

In the instant case, Plaintiffs tendered security to Defendants when they learned of MBC's troubles and prior to the filing of the present suit. Nonetheless, Defendants did not respond to Plaintiffs request to tender the security. In Randall, the Supreme Court held that the rescissory remedy under Section 12(a)(2) aims "to deter prospectus fraud[9] and encourage full disclosure as well as to make

---

[8]   Section 2(3) of the Securities Act defines "sale" or "sell" to include, among other notions, "every . . . solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3); see Shaw 82 F.3d at 1215; Pinter, 486 U.S. at 643.

[9]   Despite the Court's use of the word "fraud" in Randall, fraud is not an element of a Section 12(a)(2) claim. In Randall, the Supreme Court is exclusively referring to claims arising from the use of misleading information in prospectuses

investors whole." 478 U.S. at 659.  Thus, "by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud." Id. Therefore, Defendants are responsible for any decline in the value of the security after Plaintiffs tendered the same and as such, cannot argue that Plaintiffs' actions after the tendering of the security caused a decline in its value. See Id.

Since Plaintiffs still own the security, and have not received any income from their investment, they are entitled to the consideration paid, that is, $80,000, plus interest thereon, upon its tender. Moreover, in securities actions, defendants against whom judgment is entered are jointly and severally liable to Plaintiffs. In re Del-Val Fin. Corp. Sec. Litig., 868 F. Supp. 547, 558 (S.D.NY. 1994) (citing Musick, Peeler & Garrett v. Employers Insurance of Wausau, 124 L. Ed. 2d 194, 200-201 (1993)); See also McDermott, Inc. v. Amclyde, 511 U.S. 202, 220-221 (1994) (finding that "[j]oint and several liability applies when there has been a judgment against multiple defendants.") Thus, Defendants are jointly and severally liable to Plaintiffs for $80,000, plus interest.

This Court will now address Plaintiffs' fraud claims.

### II. Section 10(b), Rule 10b-5 and Fraud Claims

When alleging fraud in general, "a party must state with particularity the circumstances constituting fraud...". Fed. R. Civ. P. 9(b).  Therefore, in a fraud claim the time, place and content of the alleged false representations must be plead with particularity. Greebel v. FTP Software, Inc.,194 F. 3d 185, 198 (1st Cir. 1999); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 190-191.

A Section 10(b) claim is, in essence, a fraud claim under the Securities Act of 1934. Said section provides, in pertinent part, that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails:

---

for the sale of securities. See Suna, 107 F.3d at 7; Miles, 483 F.3d at 73 n.1(citing Rombach, 355 F.3d at 169 n.4; In re Suprema Specialties, 438 F.3d at 270.

... (b) [t]o use or employ, in connection with the purchase or sale of a security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. 78j.

Section 10(b)'s prohibitions were given effect almost a decade after its enactment with the SEC's adoption of Rule 10b-5. <u>SEC v. Tambone</u>, 550 F.3d 106, 121 (1st Cir. 2008). Rule 10b-5 states that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security. 17 CFR 240.10b-5.

Rule 10b-5 "is the most commonly used basis for private suits charging fraud in connection with the purchase or sale of securities." <u>Tambone</u>, 550 F.3d at 121. Since Rule 10b-5 is "coextensive" with the coverage of Section 10(b), the Supreme Court has used Section 10(b) to refer to both the statutory provision and Rule 10b-5. <u>Id.</u> at 131. Although the Securities Exchange Act does not provide for a private cause of action for Section 10(b) violations, the Supreme Court has found a right of action implied in the words of the statute and its implementing regulation. <u>Stoneridge Inc. Partners, LLC v. Scientific-Atlanta, Inc.</u>, 128 S. Ct. 761, 769 (2008); <u>see also</u> <u>Maldonado v. Rodriguez</u>, 137 F.3d 1, 6 (1st Cir. 1998).

Under said section, liability can be based on either "a material misstatement (or omission) or the commission of a manipulative act." <u>Teachers' Ret. Sys. of La. v. Qwest Communs.</u>, Fed. Sec. L. Rep. (CCH) P93, 530 (2005) (citing <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 177 (1994)). In order for a statement or misrepresentation to be actionable under Section 10(b), said statement or misrepresentation must be material. Moreover, "[f]or a given fact to be material 'there must be a substantial likelihood' that the fact 'would have been viewed by the reasonable investor

as having significantly altered the total mix of information made available.'" Id. (citing Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991).

Furthermore, considering that Section 10(b) prohibits "any person" from engaging in the fraudulent conduct therein described, its provisions are not limited to brokers. See e.g. Pinter, 486 U.S. at 646 (finding that Section 12 is applicable to "any person" who incurs in material misstatements in the sale of a security.); see also Shaw, 82 f.3d 1194 at 1214. Thus, any person who engages in the conduct therein proscribed, may be held liable under Section 10(b).

### Section 10(b) and Rule 10b-5 Standard

The Private Securities Litigation Reform Act of 1995 ("PSLRA"),15 U.S.C. § 78u-4(b)(1) and (2), imposes a heightened pleading requirement on complaints alleging securities fraud under Section 10(b), which is more strict than the standard set forth by Fed. R. Civ. P. 9(b); see City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1258 (10th Cir. 2001); Tellabs, 551 U.S. 308, 191-192. The PSLRA provides that:

[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) Made an untrue statement of a material fact; or

(B) Omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.15 U.S.C. § 78u-4(b)(1) and (2).

As such, in federal securities fraud claims, the PSLRA imposes two heightened pleading requirements. First, the complaint must specify each statement alleged to have been misleading, as well

as the reasons why the statement is misleading. Second, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. Greebel, 194 F. 3d at 198; see also Aldridge v. A.T. Cross Corp., 284 F. 3d 72, 78 (1st Cir. 2002) (finding that "[t]he plaintiff in a securities fraud action must specify each alleged misleading statement or omission including its time, place and content."); Tellabs, 551 U.S. 308, 192.

Moreover, under the PSRLA, the plaintiff must prove that defendants acted with a particular state of mind, that is, with intent, knowledge or a high degree of recklessness, also known as scienter. See Alvarado v. Morgan Stanley, 448 F. Supp. 2d 333, 336 (D.P.R. 2006) (citing Dura Pharm, Inc. v. Broudo, 544 U.S. 336, 341-342 (2005)); see also Stoneridge, 128 S. Ct at 768. Before the passage of the PSLRA, the pleading requirements for scienter in the securities context were governed by Federal Rule of Civil Procedure 9(b), which dictates that "averments of fraud . . . be stated with particularity." Fleming Cos., 264 F.3d at 1258.  After the PSLRA's enactment, in order to prevail in a Section 10(b) claim, the plaintiff, aside from stating the facts with particularity, must also show that "the defendant (1) made a material misrepresentation or omission, (2) with scienter, (3) in connection with purchase or sale of a security, (4) on which the plaintiff relied, (5) to his or her detriment." Alvarado v. Morgan Stanley, 448 F. Supp. 2d 333, 336 (D.P.R. 2006)(citations omitted); see also Stoneridge, 128 S. Ct at 768.

Therefore, to prevail in a Section 10(b) and Rule 10b-5 action, "a plaintiff must show that defendants had the requisite scienter, namely, the 'intent to deceive, manipulate, or defraud.'" Geffon v. Micriron Corp., 249 F.3d 29, 35 (1st Cir. 2001) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)).  In Geffon, the First Circuit held that in order to show scienter, "the plaintiff must prove that defendants knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors."Id.

Recently, the First Circuit further stated that in order to establish a claim of primary liability under Rule 10b-5(b), which specifically addresses the use of false statements or omissions in connection with the purchase or sale of a security, the plaintiff must show:

> (1) a material misrepresentation or omission made by the defendant; (2) a connection between the misrepresentation or omission and the purchase or sale of a security; (3) scienter, specifically that the defendant acted with intent, knowledge, or a high degree of recklessness; (4) reliance by the plaintiff upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. <u>Tambone</u>, 550 F.3d at 130; <u>see</u> <u>Stoneridge</u>,128 S. Ct. at 768.

Hence, the Court recognized that reckless statements of misleading facts are also actionable under Section 10(b) and Rule 10 b-5. <u>Id.</u>; <u>see also</u> <u>Geffon</u>, 249 F.3d at 35. As such, scienter requires a showing that the defendant intended to commit the alleged fraud or that, at least, there was a high degree of recklessness in connection with the fraud. <u>Morgan Stanley</u>, 448 F. Supp. at 336. In this context, recklessness means "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that either unknown to the defendant or is so obvious the actor must have been aware of it." <u>Id.</u>  (citations omitted). Therefore, Section 10(b) entails more than mere negligence. <u>See</u> <u>Ernst & Ernst</u>, 425 U.S. at 209.

Under the PLSRA, "allegations of scienter must be made by stating with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Rodriguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 96 (1st Cir. 2007); <u>Tellabs</u>, 551 U.S. 308, 193. This inference "need not be ironclad, [but] must be persuasive." <u>In re Credit Suisse First Boston Corp.</u>, 431 F. 3d 36, 49 (1st Cir. 2005). The inference of scienter is not strong "when, viewed in light of the complaint as a whole, there are legitimate explanations for the behavior that are equally convincing." <u>Margo Caribe</u>, 490 F.3d at 96. In this context, the "inferences must be reasonable and strong but not irrefutable... the plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely."

Aldridge, 284 F. 3d at 82. Moreover, the courts shall use a case by case and fact-specific approach when determining the sufficiency of the allegations of scienter. Id.

As previously stated, Plaintiffs have provided a detailed account of Defendants' material misrepresentations and omissions which led them to purchase the security. Specifically, Plaintiffs provided detailed evidence that shows that there was plenty of publicly available information which should have alerted Defendants of the need to make a more detailed investigation on the viatical settlement industry and, specifically, on MBC, prior to recommending the investment to Plaintiffs. MBC's shortcomings were so obvious that Defendants could have learned of such information by exercising the minimum standards of care during the sale of the viatical. Moreover, Plaintiffs proffered specific descriptions of Defendants misleading actions, omissions, and their dire consequences. This Court will not rehash the facts set forth above, which adequately support Plaintiffs' claims.

Based on the foregoing, this Court finds that Plaintiffs have been specific as to the who, what, when and why. Plaintiffs have shown that Defendants made material misrepresentations and omissions, in connection with the sale of a security (the viatical settlement). In so doing, Defendants acted with a high degree of recklessness, thus satisfying the requisite element of scienter. Said statements and omissions led Plaintiffs to buy the viatical. Had they known about the untruth of Defendants' statements, their lack of expertise in the field of viaticals, and the information that Defendants failed to disclose, Plaintiffs' decision would have been dramatically different. Moreover, by reasonably relying on Defendants' misrepresentations, Plaintiffs have suffered an economic loss. As such, all the prongs of the Section 10(b) claim test have been met. See Tambone, 550 F.3d at 130; Alvarado v. Morgan Stanley, 448 F. Supp. 2d 333, 336 (D.P.R. 2006) (citations omitted); Stoneridge, 128 S. Ct at 768.

De Jesús has failed to oppose Plaintiffs' motion for summary judgment, and the facts set forth by Plaintiffs in their SUMF are properly supported by the record. Although it is unusual to grant summary judgment on securities fraud cases, specifically on scienter, as it goes to motive or intent, it is appropriate when the nonmoving party "rests merely upon conclusory allegations, improbable

inferences, and unsupported speculation." Ficken, 546 F.3d at 51; see also Ernst & Ernst, 425 U.S. 185.

The same conclusion can be inferred in cases where the nonmoving party has failed to oppose the request

for summary judgment. See e.g. Hall v. Security Planning Services, Inc., 419 F. Supp. 405, 407-408

(D.AZ. 1976). More so, when the moving party provides ample uncontested proof as to scienter and all

other elements of the securities violations. Hall, 419 F. Supp. at 407-408.

In the instant case, Plaintiffs have provided ample uncontested proof as to all the elements of the

securities claims as they relate to these Defendants. De Jesús did not provide a single argument in

opposition. Based on the above stated uncontested facts and the applicable law, this Court finds that

Plaintiffs have adequately stated a claim under Section 10(b) and Rule 10(b)(5). As such, summary

judgment is warranted in this case.

Based on the foregoing, Plaintiffs' Section 10(b) and Rule 10b-5 fraud claims are **GRANTED.**

***Damages under Section 10(b) and Rule 10b-5***

Notwithstanding the above, this Court cannot grant Plaintiffs' request for damages under said

sections. Although Section 12(a)(2) provides a method to calculate the damages to which Plaintiffs are

entitled, that is not the case under Section 10(b).

The Supreme Court has held that "[t]he issue whether and under what circumstances rescission

or a rescissory measure of damages is available under § 10(b) is an unsettled one." Randall, 478 U.S.

at 540. Some courts have applied an "out-of-pocket" measure of damages in Section10(b) cases which

consists of the difference between the fair value of all that the plaintiff received and the fair value of

what he would have received had there been no fraudulent conduct. Others have allowed the plaintiff,

in some circumstances, to choose between "undoing the bargain (when events since the transaction have

not made rescission impossible) or holding the defendant to the bargain by requiring him to pay

[out-of-pocket] damages." Randall, 478 U.S. at 541 (citations omitted)(attentions in original).

Therefore, there is no formula for determining damages under Section 10(b).

Moreover, De Jesús is entitled to provide evidence of mitigation of damages as well as to contest the amount of damages requested by Plaintiffs, since Plaintiffs "cannot recover that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm." Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 620 (9th Cir.1981) (citing Foster v. Financial Technology Inc., 517 F.2d 1068, 1072 (9th Cir. 1975)).

Discretion as to the judgment or the need for a hearing on damages is vested with the district court. Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 64 (1st Cir. 2002) (citing Pope v. United States, 323 U.S. 1, 12 (1944)). In the instant case, this Court will exercise its discretion and will grant a hearing to determine the amount of damages to be imposed upon De Jesús under the fraud claims.

Moreover, this Court notes that in Herman & Maclean v. Huddleston, 459 U.S. 375, 386-387 (1983), the Supreme Court adopted a cumulative construction of certain remedies provided by the 1933 and 1934 Acts. Cf. In re Gap Stores, 79 F.R.D. at 307 (finding that the remedies under Sections 11 and 12 of the Securities Act of 1933 are not cumulative and Plaintiff must elect one or the other when requesting remedies); In re Itel Sec. Litigation, 89 F.R.D. 104, 115 (N.D.Ca. 1981) (holding that "even if the plaintiff can establish liability under both sections, the remedies of § 11 and section 12(2) are not cumulative, and at judgment the plaintiff must elect whether to seek damages under § 11 or § 12(2)")). It held, in pertinent part,  that:

> [a] cumulative construction of the securities laws also furthers their broad remedial purposes. In enacting the 1934 Act, Congress stated that its purpose was "to impose requirements necessary to make [securities] regulation and control reasonably complete and effective." 15 U. S. C. § 78b. In furtherance of that objective, § 10(b) makes it unlawful to use "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security. The effectiveness of the broad proscription against fraud in § 10(b) would be undermined if its scope were restricted by the existence of an express remedy under § 11. Yet we have repeatedly recognized that securities laws combating fraud should be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963). Accord, Superintendent of Insurance  v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971); Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972). We therefore reject an interpretation of the securities laws that displaces an action under § 10(b). Herman, 459 U.S. at 386-387; see also Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 926 (1st Cir. 1983).

It can be inferred that as in Section 11 suits[10], availability of an express remedy under Section 12 of the 1933 Act does not preclude defrauded purchasers of securities from maintaining an action under Section 10(b) of the 1934 Act. Id.[11]  According to the Court, the "cumulative construction of the remedies under the 1933 and 1934 Acts is also supported by the fact that when Congress comprehensively revised the securities laws in 1975, a consistent line of judicial decisions had permitted plaintiffs to sue under § 10(b) regardless of the availability of express remedies." Herman,  459 U.S. at 384.  The Court concluded that Congress' decision to leave Section 10(b) undisturbed after such well-established judicial interpretation, suggests a ratification by Congress of the cumulative nature of the Section 10(b) action. Id. at 385-386.

Therefore, this Court concluded that the remedies provided under Sections 12(a)(2) and  Section 10(b) are cumulative.

### III. Breach of Contract Claim

Plaintiff proffers a breach of contract claim under state law. Article 1209 of Puerto Rico Civil Code provides that "[c]ontracts shall only be valid between the parties who execute them and their heirs...". 31 P.R. Laws Ann. 3373; see also Dennis v. City Fed. Savs & Loan Assoc., 121 P.R. Dec.197 (1988). Upon reviewing the record, the Court notes that only MBC, represented by its President, and Plaintiffs are parties to the Viatical Purchase-Sale Contract. Plaintiffs' SUMF ¶ 12.  Although De Jesús

---

[10]   Section 11 of the Securities Act of 1933, 15 U.S.C. 77k, "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." Herman, 459 U.S. at 381.

[11]   There is no "irreconcilable conflict" between the two Acts, nor is this a case in which "'the later act covers the whole situation of the earlier one and is clearly intended as a substitute.'" Radzanower v. Touche Ross & Co., 426 U.S. 148, 154 (1976) (citing Posadas v. National City Bank, 296 U.S. 497, 503 (1936)). While some conduct actionable under sections of the 1933 Act may also be actionable under the 1934 Act, "it is hardly a novel proposition that the 1934 Act and the 1933 Act 'prohibit some of the same conduct.'" Herman, 459 U.S. at 383 (citing United States v. Naftalin, 441 U.S. 768, 778 (1979) (applying § 17(a) of the 1933 Act to conduct also prohibited by § 10(b) of the 1934 Act in an action by the SEC). In Herman, Court noted that each of the express civil remedies in the 1933 Act allowing recovery for negligent conduct are subject to procedural restrictions which not applicable to a Section 10(b) action. Id. at 383-384. As such, the application of Section 10(b) to "negligent conduct would have allowed causes of action for negligence under the express remedies to be brought instead under § 10(b), 'thereby [nullifying] the effectiveness of the carefully drawn procedural restrictions on these express actions.'" Id. at 384.

actively solicited Plaintiffs to buy the viatical, he is not a party to said contract. Docket # 129, Exhs. 6 & 7. As a result, Plaintiffs' breach of contract claim lacks merit and thus, is **DISMISSED with prejudice**.

### IV. Punitive Damages

Finally, Plaintiffs seek the imposition of punitive damages. However, "punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." Rivera-Oquendo v. Soto-Santiago, 552 F. Supp. 2d 229, 232 (D.P.R. 2008) (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67 (1981)). In the instant case, De Jesús' actions, despite being reckless, were not sufficiently so as to warrant the awarding of punitive damages. Moreover, punitive damages are generally not awarded in private actions under Section 12, Section 10(b) claims nor under Puerto Rico law. See De Haas v. Empire Petroleum Co., 435 F.2d 1223, 1232 (10th Cir. 1970); Goldberg v. Meridor, 81 F.R.D. 105 , 110 (S.D.N.Y. 1979); Globus v. Law Research Service, Inc., 418 F.2d 1276, 1283 (2nd Cir. 1969); Green v. Wolf Corp., 406 F.2d 291, 303 (2nd Cir. 1968); Burkhart v. Allson Realty Trust, 363 F. Supp. 1286, 1290 (N.D.Ill. 1973); Marina Indus., Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983). As such, Plaintiffs' request for the imposition of punitive damages is **DENIED**.

### V. Attorney's Fees and Costs

The Supreme Court has held that "parties are ordinarily required to bear their own attorney's fees -- the prevailing party is not entitled to collect from the loser." See Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602 (2001) (citing Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247 (1975)). Said reasoning, commonly referred to as the "American Rule," reflects "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." Id. (citing Key Tronic Corp. v. United States, 511 U.S. 809, 819 (1994)). However, the Court has also noted that despite the above mentioned "rule", Congress has authorized the award of

attorney's fees to the prevailing party in numerous statutes,[12] when a party disobeys court orders, and as a "sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) (citing Alyeska, 421 U.S. at 258-259).

This Court notes that under Section 10(b) claims, "a district court's power to award attorney's fees is sharply circumscribed." Ernst & Ernst, 425 U.S. at 211 n. 30.  Moreover, some circuit courts have expressly held that attorney's fees are not allowed in Section 10(b) suits. See Cotton v. Slone, 4 F.3d 176, 181 (2nd Cir.1993);  Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 555-554 (2nd Cir. 1977); Straub v. Vaisman & Co., 540 F.2d 591, 599 (3rd Cir. 1976).

Notwithstanding, Section 11(e) of the Securities Act of 1933 provides, in pertinent part, that:

> [i]n any suit under this or *any section of this sub-chapter* [sub-chapter 1]the court may, *in its discretion, require the undertaking for the payment of costs of such suit, including reasonable attorney's fees*, and if judgment shall be rendered against a party litigant, upon motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing costs in the court in which the suit was heard. 15 U.S.C. § 77k(e). (emphasis added).

Considering that Section 12(a)(2) is a section of sub-chapter 1 of the Securities Act of 1933, Section 11(e) applies in the instant case.  See Ernst & Ernst, 425 U.S. at 209.

As previously stated, shortly after purchasing the security from Defendants, and as soon as they learned about MBC's legal problems, Plaintiffs requested to meet with Defendants. When said meeting took place, Plaintiffs tendered the security to Defendants and requested the return of their initial investment. At that time, Defendants did not respond to Plaintiffs' offer to tender the security, and despite Plaintiffs' attempts to contact Defendants, they never responded to Plaintiffs' offer. Therefore,

---

[12] Such as the Civil Rights Act of 1964, 78 Stat. 259, 42 U.S.C. § 2000e-5(k), the Voting Rights Act Amendments of 1975, 89 Stat. 402, 42 U.S.C. § 1973l(e), and the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U.S.C. § 1988.

Defendants could have avoided the long and costly legal proceedings that have dragged on for the past four years.

Moreover, Plaintiffs have asked the Court on several occasions to order De Jesús to comply with discovery and have requested that default be entered due to his failure to adequately comply with this Court's orders. De Jesús eventually provided the discovery requested by Plaintiffs and, as such, this Court denied Plaintiffs' request for entry of default. However, De Jesús failed to oppose the instant motion for summary judgment and has not fully participated in the process, in order to move the case forward.

As a result, and exercising the discretion granted by Section 11(e) of the Securities Act of 1933, this Court concludes that the defenses set forth by Defendants were without merit, therefore, Plaintiffs' request for attorney's fees and costs is **GRANTED**.

**Conclusion**

Based on the foregoing, this Court finds as follows:

1.      Plaintiffs' Section 12(a)(2), Section 10(b) and Rule 10b-5 claims are **GRANTED**;

2.      Under the Section 12(a)(2) claim, Plaintiffs are entitled to $80,000, plus interest, reasonable attorney's fees and costs;

3.      Plaintiffs' breach of contract claim is **DISMISSED with prejudice**;

4.      Plaintiffs' request for the imposition of  punitive damages is **DENIED**;

5.      Plaintiffs' request for summary judgment on the amount of damages under Section 10(b) and Rule 10-b is **HELD in abeyance**, and will be ruled upon after a hearing on damages.

Thus, Plaintiffs' Motion for Summary Judgment as to the De Jesús Co-Defendants is **GRANTED in part and DENIED in part**.

As a result, the Court will proceed as follows:

1.      Judgment will be entered under Section 12 (a)(2) for the amount of $80,000, plus interest, attorney's fees and costs;

**Civil No. 04-2371(SEC)**                                                                                    **31**

2.      Judgment as to the amount on damages under Section 10(b) will be held in abeyance until a hearing is to determine the amount of damages is held;

3.      Plaintiffs shall inform this Court by **February 27, 2009** whether they want this Court to proceed on a hearing on damages under their Section 10(b) claim, or in light of the Judgment to be entered under Section 12(a)(2) for the amount of $80,000, plus interest, reasonable attorney's fees and costs, Plaintiffs choose to waive their right to a hearing on damages. If Plaintiffs choose the latter, this Court will in due course enter Judgment dismissing their Section 10(b) claim without prejudice.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 19th day of February, 2009.

*S/Salvador E. Casellas*
Salvador E. Casellas
U.S. District Judge